**THIRD DIVISION**
**DILLARD, C. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 14, 2019**

# In the Court of Appeals of Georgia

A19A0417. JOHNSON v. THE STATE.

DILLARD, Chief Judge.

Following trial, a jury convicted Isaac Johnson on three counts of voluntary manslaughter, one count of aggravated battery, one count of aggravated assault, and one count of possession of a knife during the commission of a crime. Johnson now appeals his convictions and the denial of his motion for new trial, arguing that the trial court erred in denying his claim that trial counsel rendered ineffective assistance by failing to object to a jury instruction on the law of mutual combat. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that in the early evening of April 22, 2016, Johnson—who resided in Athens but was

---

[1] *See, e.g.*, *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

homeless at the time—purchased some crack cocaine and then went to the apartment of an acquaintance, where he knew he could use drugs and party with other people. Upon arriving at the apartment, Johnson paid the owner $5 to use his place and then smoked crack with the owner and another acquaintance, whom he knew from a local church's homeless food-kitchen program. Approximately 30 minutes after Johnson's arrival, Wren Guerndt and his girlfriend, Andrea Harris, entered the apartment. Guerndt and Harris were also homeless and lived in a tent at a homeless campsite on the northwest outskirts of Athens. Upon their arrival, Guerndt and Harris did drugs with Johnson, whom they knew from some homeless shelters around town. Shortly thereafter, Johnson asked Harris if he could pay her to have sex with him. She agreed, claiming that Guerndt "let her do stuff for money." At that point, Johnson gave Guerndt $20, and he and Harris went into the apartment's bedroom while the others continued using drugs in the living room.

After hanging out at the apartment for an hour or so, Guerndt and Harris decided to return to their campsite, and Johnson said he would buy more drugs if he could join them. They agreed, and the three then left the apartment on foot, stopping at a liquor store before setting off through the woods, using the flashlight application on Johnson's mobile phone to light their way. Then, upon reaching Guerndt and

Harris's tent, another resident of the campsite asked if they wanted to go to his tent to smoke some marijuana. They accepted the invitation, and once there, Guerndt and Harris smoked marijuana and methamphetamine while Johnson smoked marijuana and crack cocaine. And while they were doing drugs, Harris asked their host if she could borrow a shovel to divert rainwater runoff from flooding their tent; but he declined the request. Johnson, Guerndt, and Harris then walked back to Guerndt and Harris's tent, and Guerndt and Harris suggested that they continue to smoke marijuana. But noting Guerndt's use of a knife to cut the rolling papers, as well as a few other knives on the ground inside the tent, Johnson expressed concern about staying with them. And in an apparent effort to ease Johnson's concern, Guerndt handed Johnson his knife, which had a blade of eight or nine inches.

Shortly thereafter, Harris announced that she had "to pee," exited the tent, and walked toward a nearby tree. And as Guerndt began crawling on the ground inside the tent, looking for a lighter, Harris asked for someone to throw her toilet paper. Johnson ignored this request, but Guerndt complied, tossing Harris a roll of toilet paper outside the tent in her direction. A brief moment later, Johnson looked up and saw Harris approaching the tent—and him specifically—with what appeared to be a board or large stick raised above her head. Wielding the knife Guerndt had just given

3

him only minutes earlier, Johnson rushed out of the tent toward Harris, stabbed her several times, and fled into the woods back toward the street. Guerndt began screaming and frantically searching the tent for something to stop Harris's bleeding before using his own cell phone to call 911. Another resident of the campsite, who was awakened by the screams, rushed to Guerndt's tent, took his phone, and walked through the woods to the street to help direct police and emergency medical services to the scene. Police arrived minutes later, but by that time, Harris had died from her wounds.

Meanwhile, after stabbing Harris, Johnson ran through the woods until he reached the street, dropping the knife during his flight. And within a few minutes, one of the police officers encountered Johnson and asked him if he made a 911 call about a woman being stabbed. Johnson responded that he had not but added, "she's really bad off. She's back behind the power station in the woods." The officer then continued heading toward the scene but radioed a description of Johnson, whom he characterized as a person of interest, to dispatch. Shortly thereafter, a second officer, who heard the first officer's report, located Johnson. But before the officer could question him, Johnson immediately volunteered that a woman had been stabbed. Johnson then attempted to lead the officer to the trail-head but was unsuccessful. He

4

also told the officer that another male at the campsite had a knife and that he took off running upon hearing a woman screaming. Additionally, Johnson admitted to the officer that he had been smoking crack. Subsequently, the officer transported Johnson to the police station, where two detectives questioned him regarding the incident. During this questioning, Johnson's account of the events continued evolving, and, eventually, he confessed to stabbing Harris, claiming that he panicked when he thought she was reaching for something. But based on the discrepancies in his account, the detectives placed Johnson under arrest.

Thereafter, the State charged Johnson, via indictment, with one count of malice murder, two counts of felony murder, one count of aggravated battery, one count of aggravated assault, and one count of possession of a knife during the commission of a crime. The case then proceeded to trial, during which the State presented the evidence discussed *supra*, as well as the testimony of a GBI medical examiner, who performed the autopsy on Harris. The medical examiner testified that Harris suffered two incised wounds and five stab wounds.[2] Two of the stab wounds proved fatal, with one penetrating Harris's heart and the other also penetrating her heart and left lung.

---

[2] The medical examiner explained that a stab wound is deeper within the body than it is long on the surface of the body, while an incised wound is longer on the surface of the body than its depth within the body.

Johnson testified in his own defense, admitting that he stabbed Harris but claiming that he did so out of fear and to protect himself when Harris came at him with a stick. More explicitly, Johnson stated that while they were at the acquaintance's apartment and throughout the night, Guerndt and Harris were whispering to each other, which made him nervous. He then claimed that his anxiety increased when he found himself in the woods at Guerndt and Harris's campsite and observed several knives in their possession and lying on the ground within the tent. Johnson further testified that his fears were realized when Harris came at him with a raised stick or board, and that he ran toward her and stabbed her in an effort to protect himself.

At the trial's conclusion, the jury convicted Johnson of three counts of voluntary manslaughter as a lesser-included offense to the counts of malice murder and felony murder. In addition, the jury also convicted Johnson on the counts of aggravated battery, aggravated assault, and possession of a knife during the commission of a crime. Johnson subsequently obtained new counsel and filed a motion for new trial, in which he argued, *inter alia*, that his trial counsel rendered ineffective assistance. But after a hearing, during which his trial counsel testified, the trial court denied Johnson's motion for new trial. This appeal follows.

In his sole enumeration of error, Johnson contends that the trial court erred in denying his claim that his trial counsel rendered ineffective assistance by failing to object to the court's jury charge on the law of mutual combat. We disagree.

In order to evaluate claims of ineffective assistance of counsel, we apply the two-pronged test established by the Supreme Court of the United States in *Strickland v. Washington*,[3] which requires Johnson to show that his trial counsel's performance was "deficient and that the deficient performance so prejudiced [him] that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."[4] In doing so, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.[5] In fact, the reasonableness of

---

[3] 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[4] *Chapman v. State*, 273 Ga. 348, 349-50 (2) (541 SE2d 634) (2001); *see Strickland*, 466 U.S. at 687 (III); *Ashmid v. State*, 316 Ga. App. 550, 556 (3) (730 SE2d 37) (2012) ("[F]irst, appellant must show that counsel's performance was deficient; second, he is required to show that he was prejudiced by counsel's deficient performance." (punctuation omitted)).

[5] *Chapman*, 273 Ga. at 350 (2); *see Cammer v. Walker*, 290 Ga. 251, 255 (1) (719 SE2d 437) (2011) ("A claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight." (punctuation omitted)).

counsel's conduct is examined from his or her "perspective at the time of trial and under the particular circumstances of the case[.]"[6] And importantly, decisions regarding trial tactics and strategy "may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course."[7] Furthermore, unless clearly erroneous, this Court will "uphold a trial court's factual determinations with respect to claims of ineffective assistance of counsel; however, a trial court's legal conclusions in this regard are reviewed *de novo*."[8] Bearing this analytical framework in mind, we turn now to Johnson's specific claim of error.

The legal concept of mutual combat is essentially a codified exception to a defense of justification.[9] OCGA § 16-3-21 (a), the codification of a justification defense, provides:

> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person

---

[6] *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016).

[7] *Id.*

[8] *Sowell v. State*, 327 Ga. App. 532, 539 (4) (759 SE2d 602) (2014).

[9] *See generally* OCGA § 16-3-21.

against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

But codifying a caveat to such defense, OCGA § 16-3-21 (b) (3) provides:

A person is not justified in using force under the circumstances specified in subsection (a) of this Code section if he . . . [w]as the aggressor or was engaged in a combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other, notwithstanding, continues or threatens to continue the use of unlawful force.

Explaining the difference between the two concepts, the Supreme Court of Georgia has held that "[t]he essential ingredient, mutual intent, in order to constitute mutual combat, must be a willingness, a readiness, and an intention upon the part of both parties to fight," and that "[r]eluctance, or fighting to repel an unprovoked attack, is self-defense, and is authorized by the law, and should not be confused with mutual combat."[10] Furthermore, we have held that to charge on mutual combat, "when there

_____

[10] *Mathis v. State*, 196 Ga. 288, 291 (1) (26 SE2d 606) (1943); *accord Berrian v. State*, 297 Ga. 740, 743 (2) (778 SE2d 165) (2015).

9

is *no evidence to support it*, effectively cancels the justification defense[, and] the charge [is] therefore error."[11]

Here, during the charge conference, the trial court indicated that it would charge the jury on mutual combat. Johnson's trial counsel expressed doubt that such a charge was applicable, but the court explained that some evidence supported such a charge and that the jury would have to weigh the credibility of the testimony pertaining to that issue. Then, following closing arguments, the trial court charged the jury on the relevant law, including, after charging as to malice and felony murder, that the jury "must first determine whether mitigating circumstances, if any, would cause the offense to be reduced to voluntary manslaughter." And after charging on the issue of provocation, the court charged the jury as follows:

> If you find from the evidence that there was between the defendant and the deceased a mutual combat – that is, a mutual intent or mutual agreement to fight – then you will consider the rules of law concerning mutual combat and apply them to the evidence. But if you

---

[11] *Flowers v. State*, 146 Ga. App. 692, 693 (1) (247 SE2d 217) (1978) (punctuation omitted; emphasis supplied); *see Grant v. State*, 120 Ga. App. 244, 245 (1) (b) (170 SE2d 55) (1969) (holding that the commingling of charges on justification and mutual combat when there is no evidence of the latter "is ipso facto harmful").

find from the evidence there was no mutual combat, you will not consider this law.

Mutual combat occurs when there is a combat between two persons as a result of a sudden quarrel or such circumstances as indicate a purpose, willingness, and intent on the part of both to engage mutually in a fight. It is not essential to constitute mutual combat that blows be struck or shots be fired. There must be mutual intent to fight or engage in combat. The existence of intent to engage in mutual combat may be established by proof of acts and conduct, as well as by proof of an express agreement.

If you find there was a mutual intention on the part of both the deceased and the defendant to enter into a fight or mutual combat and that under these circumstances the defendant killed the deceased, then ordinarily such killing would be voluntary manslaughter, regardless of which party struck the first blow.

Immediately thereafter, the trial court charged the jury on the interaction between the law as to mutual combat and justification, explaining as follows:

The killing as a result of mutual combat may be justifiable, and you may find it to be so if it appears that the defendant reasonably believed at the time of the killing that the force the defendant used was necessary to prevent death or great bodily injury to the defendant or to prevent the commission of a forcible felony, and if it appears further – if it further appears that the deceased was the aggressor. If it appears that

11

the deceased was not the aggressor but that the defendant was the aggressor, then in order for the killing to be justified, if such killing was the result of mutual combat, it must further appear that the defendant withdrew from the encounter and effectively communicated to the deceased the intent to do so, and the deceased, notwithstanding, continued or threatened to continue the use of unlawful force.

At the conclusion of the trial court's charges, Johnson's counsel reserved the objections he made during the conference, which did not include an objection to the charge on mutual combat. And, as discussed *supra*, the jury convicted Johnson of three counts of voluntary manslaughter as a lesser-included offense to the counts of malice murder and felony murder.

Johnson contends that his trial counsel rendered ineffective assistance by failing to object to the trial court instructing the jury on the law of mutual combat, specifically arguing that this failure undermined his justification defense and, thus, his chance for a full acquittal. But it is well established that "[j]ury charges must be adjusted to the evidence in the case."[12] In fact, to authorize a jury instruction on a

---

[12] *Millen v. State*, 267 Ga. App. 879, 881 (2) (a) (i) (600 SE2d 604) (2004); *see Nations v. State*, 345 Ga. App. 92, 100 (3) (812 SE2d 346) (2018) ("It is axiomatic that a jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law." (punctuation omitted)); *Reid v. State*, 341 Ga. App. 604, 613 (5) (a) (802 SE2d 42) (2017) (same).

subject, "there need only be produced at trial slight evidence supporting the theory of the charge."[13] And if there is some evidence from which the jury could find that "both parties intended to resolve their differences by fighting each other with deadly weapons, then a charge on mutual combat is justified."[14]

In this case, there was at least some evidence—in the form of Johnson's own testimony—that Harris was armed with either a stick or a board, and it is undisputed that Johnson armed himself with Guerndt's knife. Additionally, there was some evidence supporting the theory that, rather than trying to flee, Johnson affirmatively chose to charge at Harris and engage in combat and, as a consequence of that decision, fatally stabbed her. Given these particular circumstances, there was at least slight evidence to support a charge on mutual combat, and the trial court's instruction

---

[13] *Jones v. State*, 287 Ga. 770, 771 (2) (700 SE2d 350) (2010) (punctuation omitted); *accord Durden v. State*, 327 Ga. App. 173, 179 (6) (755 SE2d 909) (2014); *Hughes v. State*, 323 Ga. App. 4, 7 (2) (746 SE2d 648) (2013); *Hutto v. State*, 320 Ga. App. 235, 238 (2) (a) (739 SE2d 722) (2013).

[14] *Millen*, 267 Ga. App. at 881 (2) (a) (i); *see Sanders v. State*, 283 Ga. 372, 375 (2) (c) (659 SE2d 376) (2008) (holding that if there is any evidence from which the jury could have found that both parties intended to resolve their differences by fighting each other with deadly weapons, there is no error in giving a charge on mutual combat); *Carreker v. State*, 273 Ga. 371, 372 (2) (541 SE2d 364) (2001) (holding that because there was some evidence from which the jury could have found that both parties intended to resolve their differences by fighting each other with deadly weapons, the trial court did not err by giving a mutual combat charge).

in that regard was not erroneous.[15] Consequently, Johnson cannot show that his trial counsel's performance was deficient for failing to object to it, as such objection would have been futile.[16] Thus, the trial court did not err in denying Johnson's claim of ineffective assistance in this regard.

Moreover, although the charge on mutual combat may have carried a cost to the justification defense, "it presented the benefit of improving the chances that the

---

[15] *See Sanders*, 283 Ga. at 373-74, 375 (2) (c) (holding evidence that defendant and victim engaged in a knife fight supported mutual-combat charge); *Carreker*, 273 Ga. at 372 (2) (finding evidence that victim and defendant were both armed and additional evidence that each fired at the other supported trial court's mutual-combat charge); *Hutto*, 320 Ga. App. at 238-39 (2) (a)-(b) (holding evidence that defendant and victim came toward each to mutually engage in fight after defendant had called victim out supported mutual-combat charge, and thus, counsel did not perform deficiently in not objecting to charge); *Millen*, 267 Ga. App. at 881-82 (2) (a) (i) (finding that mutual-combat instruction was warranted given that there was evidence that defendant and victim had been fighting throughout evening; that defendant was armed; and that victim's son brought a rifle to the house before victim and son went upstairs to confront defendant).

[16] *See Sanders*, 283 Ga. at 375 (2) (c) (holding that because evidence supported mutual-combat charge, trial counsel was not deficient in failing to object to charge); *Hutto*, 320 Ga. App. at 238-39 (2) (b) (same); *Millen*, 267 Ga. App. at 881-82 (2) (a) (i) (same); *see also Ventura v. State*, 284 Ga. 215, 218 (4) (663 SE2d 149) (2008) (holding that "[t]he failure to pursue a futile objection does not amount to ineffective assistance"); *Roberts v. State*, 309 Ga. App. 681, 685 (3) (710 SE2d 878) (2011) (holding that trial court's jury charge was not error, and thus, any objection by defendant's trial counsel would have been futile).

jury might find [Johnson] guilty of only voluntary manslaughter, not murder."[17] Indeed, the jury did exactly that. And as the Supreme Court of Georgia has held "[b]ecause the mutual combat charge authorizes a jury to find the defendant guilty of voluntary manslaughter in lieu of murder, it is a charge that benefits a defendant and, as such, a convicted defendant's complaint that it was improper to give the charge is without merit."[18] Accordingly, for this additional reason, Johnson's trial counsel's failure to reserve objections to the trial court's mutual-combat charge did not constitute deficient performance, and Johnson's assertion of ineffective assistance of counsel was properly denied by the court.[19]

For all these reasons, we affirm Johnson's convictions and the denial of his motion for new trial.

*Judgment affirmed. Gobeil and Hodges, JJ., concur.*

---

[17] *State v. Mobley*, 296 Ga. 876, 881 (770 SE2d 1) (2015).

[18] *Sanders*, 283 Ga. at 375 (2) (c); *accord White v. State*, 297 Ga. 218, 219 (2) (773 SE2d 219) (2015); *see Ford v. State*, 298 Ga. 560, 565 (7) (783 SE2d 906) (2016) (holding that the giving of a mutual-combat charge would have only benefitted defendant and, thus cannot sustain an allegation of error).

[19] *Sanders*, 283 Ga. at 375 (2) (c) (citation omitted).

15